FRANKLIN SUGAR REFINING CO. v. UNITED STATES.

(Circuit Court, E. D. Pennsylvania. April 14, 1905.)

No. 104.

CUSTOMS DUTIES — BOUNTIES — COUNTERVAILING DUTY — SUGAR — DUTIABLE WEIGHT.

> *Held*, that the purpose of the provision in section 5, Tariff Act July 24, 1897, c. 11, 30 Stat. 205 [U. S. Comp. St. 1901, p. 1693], authorizing the imposition on imported merchandise of an "additional duty equal to the net amount of the bounty" paid by the exporting country, was to compel the importer to pay the total or net amount of the bounty allowed on the merchandise, and that it is the duty of the collector of customs to adopt such a basis of assessment as will accomplish this object. *Held*, also, that, as the bounty is paid on the basis of the quantity exported, it is proper to assess the additional duty on the same basis, and that as to sugar, a commodity that nearly always decreases while being imported, the additional duty should be assessed with reference to the invoice weight, or weight at time of exportation, and not the weight on arrival, subject to deduction for difference in weight due to any cause warranting an allowance.

On Application for Review of a Decision of the Board of United States General Appraisers.

For decision below, see G. A. 5,072, T. D. 23,503, which affirmed the assessment of duty by the collector of customs at the port of Philadelphia on merchandise imported by the Franklin Sugar Refining Company.

John G. Johnson, for importer.

Wm. M. Stewart, Jr., and J. Whitaker Thompson, for the United States.

HOLLAND, District Judge. The collector in this case levied a countervailing duty upon the cargo of sugar imported into the port at Philadelphia, per steamship Pilgrim, equal to the net amount of bounty paid by the exporting country, according to the invoice weight, which was 235,042 pounds greater than the landed weight. This ruling of the collector was sustained by a majority of the Board of General Appraisers in an opinion filed, which is as follows:

"The protestant imported from Hamburg, Germany, a cargo of sugar, the product of that country. According to the invoice, the total net weight of the sugar shipped was 4,328,000 kilos, or 9,541,509 pounds, being contained in 43,280 bags of 100 kilos each. Upon arrival of the vessel at the port of Philadelphia, it appeared that 23 bags had not been loaded onto the vessel, and that the 43,257 bags of sugar shipped had been reduced in weight from 9,536,438 to 9,301,396 pounds, which was the weight returned by the United States weigher.

"Regular duty was assessed on the merchandise at the rate provided by law according to polariscopic test, and in the computation of these duties the landed weight of the sugar, as returned by the United States weigher, was taken. As to this action, no controversy has arisen. Additional duty was levied on the cargo under section 5 of the act of 1897 (Act July 24, 1897, c. 11, 30 Stat. 205 [U. S. Comp. St. 1901, p. 1693]), as sugar upon which a bounty had been paid by a foreign country; and this additional duty was assessed, not on the landed weight, but on the total weight given in the in-

voice, diminished by the weight of the 23 bags shown to have been short shipped, to wit, 9,541,509, less 5,073, or 9,536,436 pounds. As to this action, the importer protests, claiming that the additional duty should be assessed on the basis of 9,301,396 pounds, the landed weight.

"This precise question was considered by us in G. A. 4,637 on a protest of the same importing company, and decided adversely to the importer. No appeal was taken from that decision, but the importer desires a reconsideration of the question by the board.

"The language of section 5, under which the assessment of additional duty was made, is as follows:

"'Sec. 5. That whenever any country, dependency, or colony shall pay or bestow, directly or indirectly, any bounty or grant upon the exportation of any article or merchandise from such country, dependency, or colony, and such article or merchandise is dutiable under the provisions of this act, then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this act, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The net amount of all such bounties or grants shall be from time to time ascertained, determined, and declared by the Secretary of the Treasury, who shall make all needful regulations for the identification of such articles and merchandise and for the assessment and collection of such additional duties.'

"The importer, in his protest, claims that the net amount of bounty on German sugars of the kind here involved, as proclaimed by the Secretary of the Treasury, is 2.40 marks per 100 kilos. Department Circular No. 86, dated June 20, 1899 (T. D. 21.274), superseded T. D. 18,217, fixing the amount of bounty at 2.50 marks per 100 kilos, and proclaimed the rate of 2.40 marks per 100 kilos, but, as this regulation was issued after the importation of the sugar here in controversy, the rate of 2.50 marks per 100 kilos must be taken.

"Counsel for the government contends that the use of the words 'net amount of any bounty or grant which may have been bestowed' indicates that it was not the intention of Congress to assess the additional duty as a rate, but that it was intended to collect an amount equal to the amount of the benefit received on exportation. The importer contends, by way of opposition, that the words 'net amount,' as found in the collocation quoted, mean exactly the same as the same words when used in the next sentence of section 5, that 'the net amount of all such bounties or grants shall be from time to time ascertained, determined and declared by the Secretary of the Treasury,' and makes the point that, inasmuch as the Secretary has declared that the net amount equals 2.40 marks per 100 kilos, the 'net amount' must be taken to mean a rate.

"We think there can be no question that 'net amount' is used in both parts of this section as meaning precisely the same thing, but whether these words mean 'rate' or not seems to us immaterial. The change from the law of 1894, which provided a constant specific rate for the additional duty, was unquestionably for the purpose of making the additional duty in all instances, as nearly as could be, equal to the amount paid by the foreign government, which amount would presumably differ from time to time. Congress, therefore, directed the Secretary to ascertain this amount from time to time, to the end that the amount of duty collected should always equal the bounty paid, however the latter might vary. It is, of course, fair to assume that Congress knew that the practical operation of section 5 would be to establish a rate which should be greater or less from time to time, inasmuch as any other method of ascertaining and declaring the amount of bounty would be impracticable; but it should be noted that the Secretary was not bound down or limited to the declaration of a rate. Congress intended that the importer should be compelled to refund what he had received from the bounty-paying government, and it was left to the Secretary of the Treasury to ascertain and declare in whatever manner he chose, either by the declara-

·tion of a rate or otherwise, just what this amount was. The extra duty, in short, was to be collected upon the merchandise upon which and for· which the bounty was granted, and was to equal the net amount of that bounty. This much is perfectly clear from the language used, and it makes no difference, therefore, whether the words 'net amount' mean 'rate,' or whether they do not. If it appear that a cargo of sugar upon which a bounty has been paid has been imported into this country, an additional duty equal to that bounty must be collected on that cargo. Two conditions only must exist: (1) The merchandise must be imported, and (2) a bounty must have been paid on that merchandise. It therefore becomes pertinent to inquire:

"(1) What 'article or merchandise' was the product of Germany, and was imported into this country?

"(2) What was the net amount of the bounty paid upon such articles or merchandise so imported?

"Having ascertained what merchandise was imported, and what bounty was paid on the merchandise so imported, the amount of duties to be assessed becomes at once apparent.

"No evidence is in the case as to what caused the decrease in the weight of the sugar, or to show that this decrease was due to other than natural causes. It is not disputed, however, that a cargo of 9,536,438 pounds was shipped from Germany, and that it was the product of that country; nor is it disputed that the cargo—that is to say, the merchandise here in question —arrived within the customs district of Philadelphia. True, it did not arrive in the condition in which it was loaded on board the vessel, and, if it were here only a question of regular duties, there could be no question that duty would have to be assessed on the merchandise in the condition in which it was imported and on the weight as imported. So far as the regular duties are concerned, this in fact is what was done, and properly. The long line of authorities following the well-known cases of Marriott v. Brune, 9 How. 619 [13 L. Ed. 282], and Austin v. Peaslee, 2 Fed. Cas. 235, have settled this point beyond cavil.

"But section 5 provides that the additional duty shall be assessed 'whether such article or merchandise is imported in the same condition as when exported from the country of production, or has been changed in condition by remanufacture or otherwise,' and the long line of authorities relating to the assessment of duty on merchandise in the condition as imported have no application. Here there is a radical difference between the rule governing the assessment of regular duties and that governing articles falling within the provisions of section 5. In the one case, if the article has undergone change through remanufacture or otherwise, duty must be assessed, not on the article as it was before it was changed, but on the article as it is in the condition in which it is imported. In the other case, the law goes back of the change, and assesses an additional duty equal to the bounty paid, not on the article in its imported condition, but on the article in its original state, whatever change may have occurred in its condition after the payment ·of bounty and before importation here. That duty is not regulated nor made dependent upon any attribute or quality of the imported article. It is regulated by one fact only, namely, the amount of bounty paid on the original article, and its accrual is dependent on one condition only, namely, that the article on which the bounty was paid is imported. Its condition on arrival is absolutely immaterial. The purpose of section 5 is to take from the importer the benefit received on his cargo, which, when paid him, practically amounts to a reduction of our dutiable rates; and any theory by which he can import his goods and pay less additional duty than the net amount on the bounty received by him would operate to defeat the section.

"Undoubtedly the importer may, if he can, prove by competent evidence that the whole or a part of the merchandise shipped was not imported into this country, and if he proves that fact, one of the conditions precedent to the collection of additional duty not having occurred, he is relieved from the payment of the additional duties. As to the 23 missing bags, that proof appears, and consequently no additional duty on those bags has been exacted, even though it may be a fact that the importer was paid a bounty thereon.

137 F.—42

The balance of the shipment, however, did arrive, and it avails the importer nothing, merely to show that its weight on arrival was less than when shipped, for this could result, and must be assumed in this case to have resulted, from a change in its condition while on the vessel. As to this merchandise, therefore, all the conditions of section 5 are fulfilled, and the additional duty must attach. The change in condition was sufficient to enable the cargo to enter at a less amount of regular duty than would be assessed on the merchandise in the condition in which it was shipped, but that change could not operate to lessen the amount of the additional duty, which, by the language of section 5, is independent of change of condition. Whether its weight became less, or whether the cargo became otherwise changed in condition by reason of remanufacture or otherwise after exportation and before importation, does not matter; so long as the cargo shipped was imported into this country, it must pay an additional duty, and that additional duty must be equal in amount to the amount of the bounty paid on that merchandise.

"As was said in G. A. 4,637: 'In the case before us, the sugar has changed in condition by evaporation or drainage, but all of the merchandise exported on which bounty was paid has been imported.'

"The point has been made that the words 'changed in condition by remanufacture or otherwise' mean only changed in condition by remanufacture, or by some process similar to remanufacture. But any artificial process is a process of manufacture, and surely the words 'or otherwise' cannot be considered to mean only processes similar to manufacture, for that construction would be meaningless. The words unquestionably mean changed in condition from any cause, and as 'remanufacture' would cover all artificial processes, so 'or otherwise' will cover such changes as occur from natural causes, such as those here under discussion.

"As showing what may constitute a changed condition, the case of Knight v. Schell, 24 How. 532, [16 L. Ed. 760], is in point. In that case, the United States Supreme Court held that barrels shipped empty to Cuba and brought back filled with molasses were not in the same condition as when exported, and were not entitled to free entry.

"It therefore appears that a certain quantity of sugar, to wit, 9,536,438 pounds, the product of a bounty-paying country, was shipped from that country, and was imported into this country, and we come to our second question, namely: What was the net amount of the bounty paid upon that cargo of sugar? The protest states that the rate of bounty assessed was 2.712 marks per 100 kilos on certain of the sugar, and 2.563 marks per 100 kilos on the balance. These figures are evidently obtained by dividing the amount of the additional duty collected by the weight returned by the United States weigher; but an inspection of the entry shows that the additional duty was assessed, not as a duty by weight of the sugar imported—for the duty on this merchandise was exacted only on the landed weight, and as to that there is no complaint—but was assessed as an amount equal to the net amount of the bounty paid on that sugar; that is to say, as a payment to this government of a sum of money received as a bounty or grant from the government of the country where the sugar was produced. The Secretary of the Treasury having, in accordance with section 5, ascertained and declared the net amount of bounty paid by Germany equaled 2.50 marks for each 100 kilos, the liquidating officer, by an arithmetical process, arrived at the total amount of bounty ascertained and declared by the Secretary of the Treasury to have been paid on the cargo imported, and duty was accordingly assessed on the cargo to an amount equal to that net amount of the bounty paid thereon. We therefore find that the amount of additional duty assessed on the merchandise here in question was equal to the net amount of the bounty paid by Germany on that merchandise, and hold that the assessment of additional duty to that amount was correct.

"If the importer's contention be correct that the extra duty must be assessed only on the landed weight, without requirement of proof as to whether or not the deficiency occurred through other than a change in its condition, then he might, if he chose, have taken his cargo from Hamburg to Liverpool, and, after having had the same remanufactured, producing a change in condition which would cause a loss in weight, import the same into this

country thus manufactured, and be compelled only to refund so much of the bounty received on the original exportation as should agree with the exact landed weight. Surely this would not be permissible under the law. It would be a nullification of the present tariff provision, and would result in assessing duties according to the provision of the act of 1894, which was repealed, and for which a different method was provided by section 5 of the present act. It follows that, if it be proper to assess the additional duty on the foreign weight when it is shown that the loss of weight is due to remanufacture, then it must be equally proper to assess the additional duty on the foreign weight when the loss in weight is due to natural causes, and thus the argument that the extra duty can be assessed only on the same basis as the main duty falls to the ground.

' "It is therefore clear that a mere shortage in weight is not prima facie evidence that the loss was due to other causes than a mere change in condition, and, unless the importer can show that the diminished weight is due to other causes, he must pay over the net amount of the bounty paid to him by the government of the country of which the goods were a product. As section 5 provides that the additional duty must be paid regardless of change in condition, the collector, in assessing the duty here complained of, must be presumed to have found that the decreased weight was due to change in condition, and the burden of proof was on the importer to show that it was not. This the importer has not done.

"In determining how much of this amount of bounty should be handed over to this government, Congress has declared that it shall be based on the amount of merchandise exported, and upon which the bounty was paid. This was essential in the case of sugar, where it is conceded that, though less in weight, it is still the same article exported. If two vessels should leave two different ports with exactly the same quantity of sugar, in the one case the sugar being the product of a bounty-paying country, and in the other the sugar being the product of a nonbounty-paying country, and the cargo of each vessel should decrease in weight through natural causes, the owner of the first cargo would, if this protest be well founded, pay only his duty and his extra duty on the landed weight, while the owner of the second cargo would pay the same regular duty. But the first owner would have received more in bounty than he would pay as additional duty, and he would therefore have an advantage over the second owner to the extent of the amount of bounty paid on the difference in weight between the exported cargo and the imported cargo. This was the very object sought to be avoided by section 5 in declaring that a change in the condition of the merchandise should not operate to lessen the amount of the additional duty, and the construction sought to be placed upon the section by the importer would operate to defeat its apparent object.

"For the reasons above set forth, we overrule the protest, and affirm the decision of the collector."

The purpose that Congress had in view when it authorized the assessment of "an additional duty equal to the net amount of bounty" paid by the exporting country was to compel the importer to pay the total or net amount of the bounty to the government upon the importation, and it is the duty of the collector, in assessing this countervailing duty, to adopt such a basis of assessment as will accomplish the object at which the legislation was aimed, to wit, to compel the importer to pay to the government the net amount of bounty he received from the exporting country. Section 5 authorizes the Secretary of the Treasury to "make all needful regulations * * * for the assessment and collection of such additional duties." It was ascertained that the bounty paid by Germany on this class of sugar is 2.50 per kilogram, and the Secretary fixed this amount to be assessed as an additional duty upon sugars imported from that country; but the collector, in order to carry out the ob-

ject and intention of Congress, as expressed in section 5 of the act of 1897, in levying this additional duty of 2.50 per kilogram, must necessarily levy it upon the weight or basis upon which it was paid, in order that he may collect from the importer the amount of money that he (the importer) received from the exporting country. This purpose is easily accomplished by adopting, as the collector did, the invoice weight. It is manifest that no other basis of assessment could be adopted that would accomplish the object of this legislation, as sugar nearly always decreases while being imported, and other changes may occur, so that the weight upon landing would scarcely ever be an accurate basis of assessment, which would result in the collection of as much duty as the importer was paid in the shape of a bounty.

The cases cited to sustain the proposition that duties should be assessed only upon the merchandise in the condition in which it is landed are not at all in point, as these decisions had reference to the assessment of either an ad valorem or specific duty which was to be levied upon the value or the amount of the merchandise arriving at our ports. But the duty to be levied in the case at bar was to accomplish a different purpose, to wit, to take from the importer the net amount of money he received from the exporting country. The language of section 5 of the act of 1897 is broad enough to authorize the adoption of such a basis of calculation as will accomplish that purpose, which can be done with certainty when the invoice weight is taken, as in this case. This does not prevent the collector from allowing a deduction from that weight, if the evidence and the facts in any particular importation warrant it. The finding, however, in this case is that the difference in weight was not the result of any cause which entitled them to an allowance.

The ruling of the Board of General Appraisers is affirmed.